**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CIVIL NO._____      **09-22962**

CLINICAL MEDICAL SERVICES, INC., a
Florida corporation,

CIV-UNGARO

      **Plaintiff,**

MAGISTRATE JUDGE
SIMONTON

v.

FILED by _AJS_ D.C.

OCT - 1 2009

AVETA, INC., a Delaware corporation, and
JOHN DOE,

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

      **Defendants.**

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, CLINICAL MEDICAL SERVICES, INC. ("CLINICAL"), through its undersigned counsel, files its Complaint against AVETA, INC. ("AVETA"), and JOHN DOE (collectively "Defendants"), and alleges:

## NATURE OF THE ACTION

1.    This is an action by CLINICAL against a health insurance company, AVETA, the parent company of CLINICAL's largest customer, MMM Healthcare, Inc. ("MMM"), and JOHN DOE, for (i) tortiously interfering with an exclusive provider services contract between CLINICAL and MMM through the misappropriation of CLINICAL's confidential and proprietary business information, (ii) tortiously interfering with CLINICAL's relationships with third parties, including those with whom CLINICAL was negotiating a potential sale of the company, and (iii) conspiring to misappropriate and misappropriating CLINICAL's confidential business and trade

secret information, in violation of Florida's Uniform Trade Secrets Act, Chapter 688. As a result of Defendants' actions, CLINICAL has suffered substantial injury in Florida, including the great loss of value of CLINICAL' business and its prospective sale of the company.

## PARTIES, JURISDICTION AND VENUE

2.    CLINICAL is a Florida corporation with its corporate headquarters located at 14101 Commerce Way, Miami Lakes, Florida 33016. CLINICAL's Executive Chairman and sole shareholder, Raul Rodriguez ("Rodriguez"), resides in Miami, Florida and primarily performs his responsibilities from CLINICAL's Miami Lakes headquarters.

3.    CLINICAL is engaged in the business of providing durable medical equipment ("DME"), respiratory services, and diabetic inhalation infusion services to Medicare beneficiaries, including MMM's members, located in Puerto Rico and the State of Florida. CLINICAL's approvals for purchases of DME equipment and services for MMM's members are made in Florida. CLINICAL pays for such equipment and services from Miami, Florida. CLINICAL receives customer payments, including those at issue in this case, in Florida. Clinical's Board of Directors' and senior executives' meetings take place in Miami, Florida.

4.    Defendant AVETA, formerly known as Aveta Holdings, LLC, is a Delaware corporation with its principal place of business in Fort Lee, New Jersey. AVETA provides managed care services primarily for Medicare beneficiaries. It operates principally in Puerto Rico, California, Canada, Illinois and New Jersey. It also provides managed care for non-Medicare or commercial beneficiaries, and provides management services for independent physician associations and for physician hospital organizations.

2

5.      Representatives of AVETA have sent e-mails and made phone calls to CLINICAL's employees in Florida in connection with this matter.  AVETA also is the parent corporation of MMM, a company incorporated under the laws of the Commonwealth of Puerto Rico.  AVETA directed and orchestrated many of the activities of MMM as are alleged herein.

6.      MMM does business in Puerto Rico and in Florida.    MMM and CLINICAL were parties to an exclusive Provider Services Agreement under which CLINICAL provided DME, respiratory services, and diabetic inhalation infusion services to MMM's Medicare plan members residing in Puerto Rico and in Florida.  MMM was CLINICAL's largest customer and payor.

7.      MMM engages in substantial and not isolated business activities in the State of Florida, which includes but is not limited to, regularly placing telephone calls and sending e-mails to CLINICAL's headquarters in Florida, making and sending payments to Florida for the benefit of CLINICAL, and conducting business negotiations with CLINICAL personnel located in Florida in furtherance of MMM's operations.  MMM also has plan members who reside in or travel to the State of Florida and CLINICAL provides services in Florida to those individuals pursuant to its Agreement with MMM.  Many of MMM's activities in Florida with CLINICAL have been directed by AVETA.

8.      Houlihan Lokey Howard & Zurkin Capital, Inc. ("Houlian Lokey") is a California corporation with its principal place of business in Los Angeles, California. Houlihan Lokey is an international investment bank which does substantial and not isolated business in the State of Florida and provides a wide range of financial advisory services, including mergers and acquisitions, financing, financial opinions and financial restructuring.  Houlihan Lokey also offers its financial advisory and investment banking services in connection with the possible

3

acquisition or sale of assets or equity interests of its clients ranging from closely-held companies to Global 500 corporations. On its website, Houlihan Lokey has advertised several transactions in which it served as the financial advisor to several Florida-based companies. Representatives of Houlihan Lokey also have traveled to Florida on several occasions in connection with the facts and circumstances alleged herein.

9.      This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      Upon information and belief, all Defendants are subject to personal jurisdiction in the State of Florida because *inter alia*: (a) at least one act in furtherance of the tort conspiracy was committed in Florida; (b) defendant AVETA itself and through the actions which AVETA directed of its wholly-owned subsidiary MMM operated, conducted, engaged in, or carried on a business or business venture in the State of Florida; (c) AVETA committed a tortious act causing injury to CLINICAL in Florida; (d) Defendants misappropriated CLINICAL's confidential information in violation of Florida Statute, 688.01 et. seq., all of which has caused substantial injury to CLINICAL in Florida, and (e) AVETA conspired with others resulting in injury suffered by CLINICAL in Florida.

11.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## GENERAL ALLEGATIONS

12.      In January 2006, representatives of Houlihan Lokey came to Florida to meet with the CEO of CLINICAL, Raul Rodriguez ("Rodriguez") and other CLINICAL representatives. At the

4

time, CLINICAL was interested in exploring a potential sale of the company to an interested buyer, and Houlihan Lokey had held itself out to CLINICAL as an expert in procuring buyers for companies that specialized in the health care industry and in advising companies like CLINICAL that were exploring potential sales or similar transactions.

13.     At all relevant times, Houlihan Lokey represented to CLINICAL that it was uniquely qualified to conduct financial analyses of CLINICAL to attract potential buyers, to assist CLINICAL's management in developing an acquisition plan, to advise CLINICAL as to the structure of sales or acquisitions transactions, to negotiate the financial aspects of the potential transactions on behalf of CLINICAL, and to facilitate the consummation of sales or acquisition transactions.  As part of these efforts, representatives of Houlihan Lokey made several visits to CLINICAL's Miami Lakes headquarters to meet with CLINICAL executives including Rodriguez and sent communications to CLINICAL in Florida by telephone, e-mail, and facsimile.

14.     During and subsequent to these meetings in Florida, CLINICAL relied on Houlihan Lokey's professional services, expertise and experience, and agreed to provide confidential proprietary information to Houlihan Lokey for its use in preparing a Confidential Offering Memorandum to be provided to interested buyers subject to strict limitations and CLINICAL's authorization.

### The Confidentiality Agreement

15.     To protect the confidential and proprietary information disclosed by CLINICAL to Houlihan Lokey, on or about January 31, 2006, CLINICAL and Houlihan Lokey entered into a Confidentiality Agreement.  The Confidentiality Agreement is attached hereto as Exhibit A.

16.     The Confidentiality Agreement was executed by Jeff Carsello, on behalf of Houlihan Lokey, in his capacity as a Vice President of the company.   Raul Rodriguez, President of CLINICAL, executed the Confidentiality Agreement on behalf of CLINICAL in Miami Lakes, Florida and payments to Houlihan Lokey were made from Florida.

17.     The Confidentiality Agreement defined "Confidential Information" as "all data, reports, financial statements, projections, documents and records containing or otherwise reflecting information concerning [CLINICAL], its affiliates, subsidiaries, officers, directors, shareholders and controlling persons, in any form or medium and whether communicated in writing, orally, or otherwise, which is provided to Houlihan Lokey by or on behalf of [CLINICAL], together with any analyses, compilations, studies or other documents prepared by [CLINICAL], Houlihan Lokey, or other parties which contain or otherwise reflect or are derivative of such information . . . ." See Exhibit A (Confidentiality Agreement at ¶ 1).

18.     Pursuant to the Confidentiality Agreement, Houlihan Lokey agreed: (a) not to disclose in any manner whatsoever all or any part of the Confidential Information, (as defined in the agreement) without the prior consent of CLINICAL, except as otherwise expressly set forth herein; (b) not to use the whole or any part of the Confidential Information for any purpose other than in connection with the potential or actual engagement of Houlihan Lokey by CLINICAL; (c) to disclose the Confidential Information only to its representatives who have a need to know the Confidential Information for the purpose of the potential or actual engagement of Houlihan Lokey, or in connection with services provided by Houlihan Lokey after such engagement, and who have been advised by company of the existence of the Confidentiality Agreement and have agreed or are under an obligation not to disclose such information; (d) to ensure that its

6

representatives act in accordance with the requirements of the Confidentiality Agreement; and (e) to be responsible for any breach of the terms of the Confidentiality Agreement by its representatives.  See Exhibit A (Confidentiality Agreement at ¶ 2).

### The Confidential and Proprietary Information Provided to Houlihan Lokey Pursuant to the Confidentiality Agreement

19.    Prior to CLINICAL's engagement of Houlihan Lokey and the execution of the Confidentiality Agreement, over the course of several years at its corporate headquarters in Miami Lakes, Florida, CLINICAL had developed, assembled, and kept, detailed and proprietary confidential and trade secret information (hereinafter "Confidential Information"), including: (a) business plans relating to the durable medical equipment, respiratory services, and diabetic inhalation infusion services, including proprietary data related to CLINICAL's profit margins; (b) information relating to the internal practices as how to transact business with providers of managed care services; (c) marketing strategies and approaches regarding the durable medical equipment, respiratory and infusion services industry; (d) market information; (e) financial data; and (f) information concerning CLINICAL's structure, operations, personnel and functions, and other fee for service health plans.

20.    Pursuant to the Confidentiality Agreement, and at Houlihan Lokey's request, CLINICAL generated in Miami Lakes, Florida reports and documents containing its Confidential Information which were transmitted to Houlihan Lokey.  In acquiring CLINICAL's Confidential Information, Houlihan Lokey sent communications to CLINICAL in Florida by telephone, e-mail, and facsimile.

**Houlihan Lokey Prepares A Confidential Offering Memorandum**

21.     In August 2006, having utilized CLINICAL's Confidential Information, Houlihan Lokey prepared and finalized a Confidential Offering Memorandum (hereinafter "COM") on behalf of CLINICAL for distribution to a limited number of interested buyers. The COM contained highly sensitive financial and proprietary information, which was generated and maintained in, and transmitted from Miami Lakes, Florida, about CLINICAL's business and contractual relationships with its payors, including data as to CLINICAL's profit margins.

22.     Due to the highly sensitive and confidential nature of the information contained in the COM, CLINICAL only authorized Houlihan Lokey to send the COM to a limited number of prospective acquirers approved by CLINICAL in advance. The receipt of the COM by the prospective acquirers was subject to, and conditioned upon, their agreement to strict conditions of confidentiality and an executed confidentiality agreement.

23.     The COM itself was entitled "Confidential Information Memorandum" and the header of the first page of the COM contained the following caption marked in all caps, "CONFIDENTIAL MATERIAL." The first page also made clear that the COM only was being provided in the party's capacity as a prospective purchaser of CLINICAL. The COM then stated, "receipt of this document evidences your understanding and consent to the following: This Memorandum contains confidential information regarding CLINICAL." "The existence of this Memorandum itself shall be deemed confidential. By accepting this Memorandum, the recipient agrees that it (i) will cause its directors, officers, employees, attorneys, accountants, financial advisors and representatives who are assisting in the evaluation of the proposed Transaction to use the

8

Memorandum and such Confidential Information only to evaluate such Transaction, and for no other purpose," and "(ii) will not divulge any such Confidential Information to any other party in any way or form whatsoever." "Neither this Memorandum nor the Confidential Information herein is, in whole or in part, to be reproduced, disclosed to any other person, or used for any other purpose other than in your capacity as a potential party to the Transaction and as set forth herein."  The COM also warned, "[t]his Memorandum and the Confidential Information contained herein are proprietary, sensitive, and confidential, and you must ensure their treatment as such by each person who assists you in your evaluation with whom you share the Confidential Information in accordance herewith.  Release of Confidential Information to any other persons could be damaging to CLINICAL."

24.     From August through October 2006, Houlihan Lokey sent the COM to a limited number of interested buyers approved by CLINICAL.  These buyers were obligated to treat the COM as confidential.  The COM was well received by these potential buyers, some of whom visited CLINICAL's headquarters in Miami Lakes.  Indeed, in September and the early part of October 2006, CLINICAL received four separate bids from interested buyers with the highest bids exceeding $200 million dollars.

25.     At all relevant times, CLINICAL, through its Executive Chairman Rodriguez made it abundantly clear to Houlihan Lokey that the information contained in the COM was never to become public, much less made available to CLINICAL's customers such as AVETA and MMM.

26.     As reflected in language of the COM, Houlihan Lokey knew that it was extremely important to CLINICAL that the information contained in the COM remain confidential.

9

Houlihan Lokey also knew that CLINICAL did not want the information contained in the COM to end up in the hands of AVETA or MMM, and that any such unauthorized disclosure to AVETA or MMM could be highly damaging to CLINICAL's business and contractual relationship with MMM, which was CLINICAL's largest customer.

### CLINICAL's Relationship with MMM and AVETA

27.     In February 2006, CLINICAL and MMM formally executed an exclusive Provider Services Agreement (hereinafter "Provider Agreement") under which CLINICAL provided durable medical equipment, respiratory services, home IV and infusion services, respiratory medications, and internal nutrition services to MMM's Medicare plan members. The Provider Agreement was made retroactive in effect to August 1, 2005. The Provider Agreement took the place of an earlier 2004 agreement between MMM and CLINICAL.

28.     As part of the contractual relationship, (i) CLINICAL approved and paid from Florida orders for DME and other items; (ii) CLINICAL received in Florida payments from MMM for DME and services rendered to MMM's Medicare plan members through CLINICAL's bank account located in Florida; (iii) CLINICAL provided DME and other services to MMM members in Puerto Rico and in Florida; (iv) MMM sent communications to CLINICAL in Florida by telephone, e-mail, and facsimile.

29.     CLINICAL had a reasonable expectation that the Provider Agreement between CLINICAL and MMM would be renewed. In fact, prior to the wrongful conduct described below, CLINICAL had been assured by MMM that the Provider Agreement would be renewed prior to its expiration in July 2009.

10

**AVETA's Business Strategy and Improper Receipt and Use of CLINICAL's**

**Confidential Information**

30.     In early 2006, AVETA had plans to take advantage of its growing business, and planned to go public.

31.     In April, 2006, AVETA filed an S-1 registration statement.  However, business set backs and performance problems prevented it from going forward with its IPO.

32.     As a result of its inadequate performance, AVETA terminated the employment of a number of its senior executives, as well as those from MMM.

33.     On October 29, 2006, as evidenced by an internal AVETA e-mail, AVETA's senior officers and directors including Daniel Straus, Joe Marks, John Brittain, Douglas Malton and Jonathan Rich agreed to use improper means to implement a squeeze play against CLINICAL and others in order to make up for a series of major business errors and miscalculations by AVETA, including, but not limited to its disastrous August, 2006 acquisition of Preferred Medical Care ("PMC").

34.     On the following day, on October 30, 2006, Jonathan Rich, then an officer and General Counsel for AVETA, sent a letter on behalf of AVETA and on AVETA's letterhead to Raul Rodriguez of CLINICAL in which AVETA put CLINICAL on notice of intent to terminate the Provider Agreement. The letter recited a number of purported breaches of the Provider Agreement by CLINICAL.  The letter also falsely accused CLINICAL of making "material misrepresentations" during the course of the negotiations of the Provider Agreement and reserved the right to rescind the Provider Agreement in its entirety.

35.    This notice of intent to terminate was orchestrated in bad faith and was part of an overall strategy by AVETA to "shake down" its providers and suppliers by breaching and renegotiating existing contracts with MMM's vendors in order to save money that was owed.

36.    As a result of AVETA's October 30, 2006 termination letter and certain other behavior by AVETA, CLINICAL, in effect, has been precluded from going forward with its business relationship with MMM or reaching any agreement with MMM as to future business or contractual dealings.

37.    The impasse has led CLINICAL to file an arbitration proceeding against MMM, pursuant to the terms of the Provider Agreement.  The still-pending arbitration only involves contractual claims against MMM arising out of MMM's improper termination and breaches of the Provider Agreement.

### Clinical Discovers the Unauthorized Disclosure of the Confidential Offering Memorandum to AVETA

38.    Around the time that AVETA sent the October 30, 2006 notice of intent to terminate, CLINICAL learned that AVETA had improperly come into possession of CLINICAL's confidential business information.

39.    On November 1, 2006, CLINICAL President Raul Rodriguez, concerned about AVETA's notice of intent to terminate the MMM contract, attended a meeting with Rick Shinto at AVETA's corporate headquarters in Fort Lee, New Jersey.  At the meeting, on behalf of Aveta, Rick Shinto asked Raul Rodriguez whether he "actually thought" he could sell CLINICAL without Daniel Straus, "finding out about it."  "He has relationships with every investment bank in New York."  "These people are not nice people, their "MO" is to terminate and then negotiate."

12

40.     Two months later, on January 10, 2007, a meeting took place between representatives of AVETA, MMM and CLINICAL in which AVETA's General Counsel, Jonathan Rich taunted Raul Rodriguez by stating that "his days of selling the company were over."

### AVETA's Admission of Receipt of the Confidential Offering Memorandum

41.     Prior to and after transmitting its Confidential Information to Houlihan Lokey pursuant to the Confidentiality Agreement, CLINICAL has never disclosed in any publicly available document sensitive data relating to CLINICAL's profit margins.

42.     Nevertheless, AVETA received and misappropriated the Confidential Information contained in the COM.   On April 10, 2008, Dr. Rick Shinto, AVETA's President and Chief Executive Officer, wrote a letter to CLINICAL President Raul Rodriguez relating to issues concerning the arbitration proceeding.   In that letter, Dr. Shinto was attempting to refute a claim made by CLINICAL that CLINICAL's financial viability was in jeopardy.   In doing so, Dr. Shinto wrote: "The reduction in the capitation payment is based on the fact that the actual cost is so much less than the capitation payment of $___ PMPM.   **Indeed, Clinical confirmed in its 2006 prospectus that its profit margins exceeded ___%."**[1]   (emphasis supplied).   The fact that Dr. Shinto's letter was explicitly referring to the COM prepared by Houlihan Lokey was made plain fourteen (14) months later.

43.     On June 25, 2008, MMM filed a Memorandum of Law in Opposition to CLINICAL's Emergency Motion to Maintain Status Quo in the Puerto Rico arbitration.   The Memorandum repeated Dr. Shinto's prospectus statement from the April 10, 2008 letter almost verbatim: "The reduction in the capitation payment is based on the fact that the actual cost is so much less than

[1] CLINICAL has redacted the profit margin figures from Dr. Shinto's letter and from Exhibit "B" referred to below due to the sensitive nature of the information.  CLINICAL is prepared to file the complete documents subject to

the capitation payment of $__ PMPM. **Indeed, Clinical *boasted* in its 2006 prospectus that its profit margins exceeded ___%.**" (emphasis supplied) Other than change "confirmed" to "boasted", the statements in the Shinto letter and the Memorandum of Law are identical.

44.    Then, as to leave no doubt as to its unauthorized receipt of the COM, MMM attached to its Memorandum several pages of the COM prepared by Houlihan Lokey as an Exhibit. The cover page of the Memorandum and the excerpts of the COM are attached as Ex. B. The portions of the COM filed by MMM include the first page, which outlines the strict confidentiality terms agreed to by all recipients of the COM and is entitled "CONFIDENTIAL MATERIAL." Of note, both the "Issued to" and "Memorandum #" sections of the COM filed by MMM are blank. The "Issued to" section should have contained the name of the authorized third party to which Houlihan Lokey sent the COM. The "Memorandum #" section should have contained a unique book number assigned to each authorized recipient of the COM.

45.    Neither AVETA nor MMM was ever authorized by CLINICAL to receive or use the COM.

46.    CLINICAL has sought diligently but without success to determine how AVETA and MMM improperly came into possession of the COM. Houlihan Lokey has denied providing the COM to AVETA or MMM, who have refused to advise CLINICAL as to how they came into possession of the COM. However, CLINICAL has recently learned that the son-in-law of AVETA's Chairman, Daniel Straus (who coincidentally is also named Daniel Strauss) was employed at Houlihan Lokey during the relevant time period. If Houlihan Lokey provided the COM to AVETA or MMM or otherwise failed to protect the COM allowing it to be obtained by

---

entry of a protective order or under seal for *in camera* inspection at an appropriate time.

AVETA or MMM, then it is also responsible for damages suffered by CLINICAL. If AVETA or MMM acquired the COM from JOHN DOE (someone other than Houlian Lokey) then JOHN DOE is also liable to CLINICAL.

**Potential Acquirers Withdraw All Offers to Purchase Clinical**

47.    Prior to the disclosure of the confidential information to AVETA and its termination of the Provider Services Agreement prospective Buyers showed substantial interests in acquiring CLINICAL, including visiting CLINICAL's offices in Miami, Florida. Ultimately, CLINICAL received four bids to acquire all or a majority of CLINICAL ranging from $160 to over $240 million dollars.

48.    Using improper means, AVETA has caused MMM to breach its obligations to CLINICAL, by instructing MMM not to pay monies due to be paid to CLINICAL in Miami, Florida.

49.    Using improper means, AVETA issued its October 30, 2006 notice of intent to terminate and caused MMM to issue its March 31, 2009 notice of non-renewal of its contract with CLINICAL.

50.    Subsequent to AVETA's October 2006 termination letter, four potential buyers withdrew respective bids, ranging from $160 to over $240 million dollars, to acquire a majority or all of CLINICAL. As a result of Defendants' actions, CLINICAL is and has been unable to consummate a transaction on the same or similar terms that were being offered prior to the unauthorized disclosure of Confidential Information to AVETA.

## COUNT I

**(Violation of Florida's Trade Secrets Act, Chapter 688.01 et. seq. Against all Defendants)**

51.    CLINICAL repeats and re-alleges the allegations set forth in paragraphs 1 through 50 above as if fully set forth herein.

52.    The COM prepared by Houlihan Lokey for the prospective sale of CLINICAL contained sensitive and proprietary Confidential Information as previously defined herein that was not generally known or readily ascertainable by proper means by other persons who could obtain economic value from its use or disclosure. This Confidential Information, including pricing and profit margin data, was quite valuable to CLINICAL and its economic value was predicated on the information remaining secret.

53.    At all times, both before and after engaging Houlihan Lokey, CLINICAL took reasonable steps to protect the secrecy of its Confidential Information, including but not limited to, executing the Confidentiality Agreement with Houlihan Lokey regarding the transmission and use of the Confidential Information.

54.    Defendant JOHN DOE acquired CLINICAL's Confidential Information under circumstances creating a duty to maintain the secrecy of that information and knowing full well that the information constituted protected trade secrets.

55.    Defendant JOHN DOE willfully and maliciously misappropriated CLINICAL's Confidential Information by providing it to Defendant AVETA without authorization from CLINICAL.

56.    Defendant JOHN DOE made this disclosure through the use of improper means.

16

57.     Defendant AVETA, in turn, acquired CLINICAL's Confidential Information from JOHN DOE knowing full well that the information constituted protected trade secrets.

58.     Defendant AVETA willfully and maliciously misappropriated CLINICAL's Confidential Information by receiving and holding the CLINICAL's Confidential Information without justification and with improper means using the information for its own benefit.

59.     As a direct and proximate cause of Defendants' actions, CLINICAL has suffered and will continue to suffer substantial economic damages in an amount to be determined at trial but believed to be in excess of $200 million dollars.

60.     Defendant AVETA also has been unjustly enriched based on the unlawful misappropriation of CLINICAL's Confidential Information.

61.     Defendant AVETA's use of CLINICAL's secret and confidential information has and will continue to damages CLINICAL's business and business interests.

62.     Defendants, unless restrained, will continue to be unjustly enriched to CLINICAL's prejudice and damage.

63.     Pursuant to Section 688.005, Florida Statutes, CLINICAL is entitled to recover its reasonable attorney's fees from Defendants.

64.     Defendants AVETA, and JOHN DOE are liable to CLINICAL for compensatory and consequential damages in an amount to be determined at trial, and are also liable to CLINICAL for exemplary damages because they have acted maliciously and with willful and wanton disregard for CLINICAL's rights.

17

## COUNT II
### (Tortious Interference With Contractual Relations Against All Defendants)

65.    CLINICAL incorporates by reference the allegations of paragraphs 1 through 50 as if fully set forth herein.

66.    Executed in February 2006 and made retroactively effective from August 1, 2005, CLINICAL and MMM were parties to the exclusive Provider Agreement as previously described herein in which CLINICAL provided durable medical equipment and other medical services to MMM's Medicare plan members.

67.    Defendants AVETA and JOHN DOE were aware of the Provider Agreement between CLINICAL and MMM.

68.    Defendants AVETA and JOHN DOE intentionally and unjustifiably interfered with contractual relations between CLINICAL and MMM and induced MMM to breach the Provider Agreement by disclosing and misappropriating CLINICAL's confidential information, and causing MMM to stop paying CLINICAL and commit other breaches of contract.

69.    In addition, using improper means, AVETA sent its October 30, 2006 notice of intent to terminate the provider agreement between MMM and CLINICAL and caused MMM to issue its March 31, 2009 notice of non-renewal the Provider Agreement.

70.    As a direct and proximate result of the wrongful actions described herein, CLINICAL has suffered damages.    Defendants AVETA and JOHN DOE are liable to CLINICAL for compensatory and consequential damages in an amount to be determined at trial, and are also liable to CLINICAL for punitive damages because they have acted maliciously and with willful and wanton disregard for CLINICAL's rights.

18

## COUNT III
### (Tortious Interference With Business Relationships Against All Defendants)

71.    CLINICAL incorporates by reference the allegations of paragraphs 1 through 50 as if fully set forth herein.

72.    In January 2006, CLINICAL engaged Houlihan Lokey as a financial advisor on a potential sale of CLINICAL to select interested buyers.    Pursuant to the Confidentiality Agreement, CLINICAL disclosed Confidential Information, as previously described herein, to Houlihan Lokey for the purpose of preparing the Confidential Offering Memorandum.    The COM was finalized in August 2006 for transmission to authorized prospective third-party buyers subject to strict confidentiality requirements previously described herein.

73.    Defendants AVETA and JOHN DOE were aware that the COM contained sensitive and proprietary Confidential Information.    Defendants also were aware that CLINICAL was in the process of soliciting acquisition bids for the company.

74.    Defendants, AVETA and JOHN DOE using improper means, intentionally interfered with the prospective economic advantage in the form of a contemplated sale and acquisition of CLINICAL by interested buyers by disclosing and misappropriating CLINICAL's Confidential Information to MMM and others.

75.    As a direct and proximate result of Defendants' wrongful actions described herein, CLINICAL has suffered damages.    Defendants AVETA and JOHN DOE are liable to CLINICAL for compensatory and consequential damages in an amount to be determined at trial.    Defendants are also liable to CLINICAL for punitive damages because Defendants have acted maliciously and with willful and wanton disregard for CLINICAL's rights.

## COUNT IV
### (Conversion Against All Defendants)

76.    CLINICAL repeats and re-alleges the allegations set forth in paragraphs 1 through 50 above as if fully set forth herein.

77.    At all times CLINICAL was, and still is, entitled to the exclusive possession of its Confidential Information, and all physical embodiments thereof, including electronic and hard copy documents.

78.    Defendants AVETA and JOHN DOE misappropriated and took CLINICAL's Confidential Information, namely, the Confidential Information contained in the COM, and without authority and using improper means converted this information for their own benefit.

79.    Defendants AVETA and JOHN DOE's actions have caused, and will continue to cause, CLINICAL immediate and substantial economic damage.  Defendants are liable to CLINICAL for compensatory and consequential damages in an amount to be determined at trial.  Defendants are also liable to CLINICAL for punitive damages because Defendants have acted maliciously and with willful and wanton disregard for CLINICAL's rights.

## COUNT V
### (Conspiracy Against All Defendants)

80.    CLINICAL incorporates by reference the allegations of paragraphs 1 through 50 as if fully set forth herein.

81.    Defendants AVETA, along with MMM, conspired with JOHN DOE and/or Houlihan Lokey to do an unlawful act; namely, to misappropriate CLINICAL's Confidential Information for the purpose of tortiously interfering with CLINICAL's contractual and business relationships.

20

82.    Defendants, using improper means, executed overt acts in furtherance of the conspiracy; including, but not limited to, obtaining, disseminating and utilizing without authorization CLINICAL's Confidential Information contained in the COM.

83.    Defendants' actions have caused, and will continue to cause, CLINICAL immediate and substantial economic damage, as a result of the acts performed through the conspiracy. Defendants are liable to CLINICAL for compensatory and consequential damages in an amount to be determined at trial.  Defendants are also liable to CLINICAL for punitive damages because Defendants have acted maliciously and with willful and wanton disregard for CLINICAL's rights.

WHEREFORE, CLINICAL prays for judgment against Defendants AVETA and JOHN DOE and for the following relief:

A.    Compensatory and consequential damages in the amount of no less than $200,000,000 for the damages actually sustained by CLINICAL, which include, among other items, lost profits, the loss of CLINICAL's ability to consummate its contemplated sale as a result of the disclosure and misuse of its Confidential Information;

B.    The return of all Confidential Information;

C.    A permanent injunction restraining Defendants from further disclosing or using CLINICAL's Confidential Information or the COM in any manner;

D.    Punitive damages in an amount to be determined at trial arising out of Defendants' willful, wanton and outrageous conduct;

E.    Exemplary damages, as provided by Florida Statute, 688.004, in an amount to be determined at trial arising out of Defendants' willful and malicious misappropriation of CLINICAL's Confidential Information;

F.    Interest;

G.    Attorney's fees;

H.    Other damages as contemplated by and available under
applicable law;

I.    Such further relief as the Court deems just and proper under
the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.


Dated: October 1, 2009                    Respectfully submitted,

Stanley H. Wakshlag (Fla. Bar No. 266264)
Jeffrey E. Marcus (Fla. Bar No. 310890)
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard, Suite 1100
Miami, Florida  33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

Attorneys for Plaintiff

22



# HOULIHAN LOKEY HOWARD & ZUKIN

### INVESTMENT BANKING SERVICES

www.hlhz.com

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into by Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") for the benefit of Clinical Medical Services, Inc. (the "Company").

### RECITALS

A. The Company may engage, or has engaged, Houlihan Lokey to act in a financial advisory and/or investment banking capacity on behalf of the Company; and

B. In connection with such potential or actual engagement, the Company may provide Houlihan Lokey with certain information concerning the Company, its affiliates, subsidiaries, officers, directors, shareholders and controlling persons, as well as certain information relating to its business, prospects and customers.

### AGREEMENT

NOW, THEREFORE, in consideration of Houlihan Lokey's receipt of such information, Houlihan Lokey agrees as follows:

1.  As used in this Agreement, "Confidential Information" shall mean all data, reports, financial statements, projections, documents and records containing or otherwise reflecting information concerning the Company, its affiliates, subsidiaries, officers, directors, shareholders and controlling persons, in any form or medium and whether communicated in writing, orally, or otherwise, which is provided to Houlihan Lokey by or on behalf of the Company, together with any analyses, compilations, studies or other documents prepared by the Company, Houlihan Lokey, or other parties which contain or otherwise reflect or are derivative of such information, but does not include information:

    (a)  that was already in Houlihan Lokey's possession, or that was available to Houlihan Lokey on a non-confidential basis, prior to the time of disclosure to Houlihan Lokey;

    (b)  obtained by Houlihan Lokey from a third person which, insofar as is known to Houlihan Lokey, is not subject to any legal, contractual or fiduciary prohibition or obligation against disclosure; or

    (c)  which is or becomes generally available to the public through no fault of Houlihan Lokey or any of its agents, advisors, attorneys, affiliates, employees, officers or directors (collectively, "Representatives").

Chicago • 123 North Wacker Drive, 4th Floor • Chicago, Illinois 60606 • tel.312.456.4700 • fax.312.346.0951

Los Angeles New York San Francisco Washington, D.C. Minneapolis Dallas Atlanta London

Broker/dealer services through Houlihan Lokey Howard & Zukin Capital. Investment advisory services through Houlihan Lokey Howard & Zukin Financial Advisors.



EXHIBIT

A

2.  Houlihan Lokey agrees:

    (a)    not to disclose in any manner whatsoever all or any part of the Confidential Information, without the prior consent of the Company, except as otherwise expressly set forth herein;

    (b)    not to use the whole or any part of the Confidential Information for any purpose other than in connection with the potential or actual engagement of Houlihan Lokey by the Company;

    (c)    to disclose the Confidential Information only to its Representatives who have a need to know the Confidential Information for the purpose of the potential or actual engagement of Houlihan Lokey, or in connection with services provided by Houlihan Lokey after such engagement, and who have been advised by Houlihan Lokey of the existence of this Agreement and have agreed or are under an obligation not to disclose such information;

    (d)    to ensure that its Representatives act in accordance with the requirements of this paragraph; and

    (e)    to be responsible for any breach of the terms of this Agreement by its Representatives.

3.  Houlihan Lokey will:

    (a)    promptly notify the Company of any request or requirement, arising in connection with any judicial or other proceedings, for Houlihan Lokey to disclose all or any portion of the Confidential Information;

    (b)    refrain from disclosing that Confidential Information until the Company has had a reasonable opportunity to seek an appropriate protective order or other injunctive relief, or has waived Houlihan Lokey's compliance with this Agreement, in connection with such request or requirement; and

    (c)    not oppose an action by the Company to obtain an appropriate protective order or other injunctive relief with respect to such request or requirement, or to obtain other reliable assurances that the Confidential Information will continue to be treated confidentially, all of which shall be at the Company's sole expense.

4.  If:

    (a)    the Company fails to obtain a protective order or other injunctive relief in the manner described in paragraph 3 above; and

    (b)    in the opinion of Houlihan Lokey's legal counsel, Houlihan Lokey is required by applicable law or regulatory authority to disclose such Confidential Information,

Houlihan Lokey may disclose such Confidential Information, but may not disclose any other part thereof.

5.  Houlihan Lokey shall, promptly upon the written request by the Company, return any Confidential Information provided by the Company to Houlihan Lokey that exists in any tangible form, including all copies and notes thereof, except for:

    (a)    any analyses, compilations, studies or other documents prepared by Houlihan Lokey or its Representatives based on, containing or reflecting any Confidential Information, which

documents shall continue to be held by Houlihan Lokey in confidence, subject to the terms of this Agreement;

(b) Confidential Information which Houlihan Lokey certifies in writing has been destroyed;

(c) one copy of all Confidential Information furnished to Houlihan Lokey, which information shall be retained by Houlihan Lokey's records management or legal department for archive purposes only (provided that Houlihan Lokey's obligations hereunder shall remain in full force and effect); and

(d) Confidential Information which Houlihan Lokey is required to retain in order to satisfy the requirements of any law, regulation or securities exchange rule (provided that Houlihan Lokey's obligations hereunder shall remain in full force and effect).

6. Houlihan Lokey acknowledges that damages may be inadequate compensation for breach of this Agreement and, subject to the discretion of any court, the Company shall be entitled to seek equitable relief and may restrain, by an injunction or similar remedy, any breach or threatened breach of this Agreement.

7. This Agreement shall remain in effect for a period of one year from the date hereof.

8. Whether or not the Company engages Houlihan Lokey, this Agreement will not preclude Houlihan Lokey, or any of its affiliated entities, from pursuing, investigating, analyzing or engaging in business relationships or transactions (whether as a financial advisor, investment banker, principal or otherwise) which involve the Company, or other entities engaged in a business which is similar to the business of, or the same industry as, the Company, provided that nothing in this paragraph shall be construed in any way to limit the obligations of Houlihan Lokey with respect to the Confidential Information.

9. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

Agreed as of January 27, 2006 by:

**HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.**

By: _____
    Name: Jeff Carsello
    Title: Vice President

Accepted as of ___1-31-, 06___ by:

**CLINICAL MEDICAL SERVICES, INC.**

By: _____
    Name: _Raul Rodriguez_
    Title: _President_

AMERICAN HEALTH LAWYERS ASSOCIATION
ALTERNATE DISPUTE RESOLUTION SERVICE

--------------------------------------------- x

CLINICAL MEDICAL SERVICES, INC.                    :

                  Claimant,           : Case No. A-091707-566

        vs.                                     :

MMM HEALTHCARE, INC.,                              :

                Respondent.          :

--------------------------------------------- x

## MMM HEALTHCARE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO CLINICAL MEDICAL SERVICES, INC.'S EMERGENCY MOTION TO MAINTAIN STATUS QUO

Respondent MMM Healthcare, Inc. ("MMMHC"), by its undersigned counsel, respectfully submits this memorandum of law in opposition to Clinical Medical Services, Inc.'s ("Clinical") Emergency Motion to Maintain Status Quo, dated June 20, 2008 (the "Emergency Motion"). Submitted herewith in opposition to Clinical's Emergency Motion are the Affidavit of Dr. Rick Shinto, MMMHC's Chief Executive Officer and the Declaration of Juan Arill-Garcia, Vice President of Information Technology at MMMHC.

## PRELIMINARY STATEMENT

For a number of reasons, which are discussed in more detail below, Clinical has utterly failed to demonstrate that it is entitled to any injunctive relief in this case:

- Clinical cannot genuinely claim that it will suffer irreparable harm if it does not receive a capitation payment of $29.00 PMPM between now and January 2009, when

STAM1-861635-1

**EXHIBIT**

tabbies

B



**cms**
Clinical Medical Services, Inc.
*Llevando salud a todo Puerto Rico*

CONFIDENTIAL INFORMATION MEMORANDUM

AUGUST 2006



HOULIHAN LOKEY HOWARD & ZUKIN
INVESTMENT BANKING SERVICES

200 Crescent Court, Suite 1900
Dallas, TX 75201
(214) 220–8470

Los Angeles ♦ New York ♦ Chicago ♦ San Francisco ♦ Washington, D.C.
Minneapolis ♦ Dallas ♦ Atlanta ♦ London ♦ Paris ♦ Frankfurt

# CONFIDENTIAL MATERIAL



Houlihan Lokey Howard & Zukin ("Houlihan Lokey") has been retained by Clinical Medical Services, Inc. ("CMS" or the "Company") as exclusive financial advisor to assist the Company with a strategic transaction (the "Transaction").

This Confidential Information Memorandum (the "Memorandum") is provided to you in your capacity as a potential party to a Transaction. Your receipt of this document evidences your understanding and consent to the following:

This Memorandum contains confidential information regarding CMS (the "Confidential Information"). The existence of the Memorandum itself shall be deemed confidential. By accepting this Memorandum, the recipient agrees that it (i) will cause its directors, officers, employees, attorneys, accountants, financial advisors and representatives who are assisting in the evaluation of the proposed Transaction to use the Memorandum and such Confidential Information only to evaluate such Transaction, and for no other purpose, (ii) will not divulge any such Confidential Information to any other party in any way or form whatsoever, and (iii) shall return this Memorandum to the Company upon request thereof.

Neither this Memorandum nor the Confidential Information herein is, in whole or in any part, to be reproduced, disclosed to any other person, or used for any purpose other than in your capacity as a potential party to a Transaction and as set forth herein.

This Memorandum and the Confidential Information contained herein are proprietary, sensitive and confidential, and you must ensure their treatment as such by each person who assists you in your evaluation with whom you share the Confidential Information in accordance herewith. Release of Confidential Information to any other persons could be damaging to CMS.

The information contained in this Memorandum was obtained from the Company and other sources. Any estimates or projections contained herein have been prepared by management of the Company and involve elements of subjective judgment and analysis that may or may not prove to be accurate. While the information included herein is believed to be reliable, neither the Company nor Houlihan Lokey, by delivery of the Memorandum, makes any representations or warranties, expressed or implied, as to the accuracy or completeness of such information. This Memorandum does not purport to contain all of the information that may be required to evaluate a Transaction and any recipient hereof should conduct its own independent analysis of the Company and the data contained or referred to herein.

In furnishing this Memorandum, the Company and Houlihan Lokey reserve the right to amend or replace this Memorandum at any time, but undertake no obligation to update, correct or supplement any information contained herein or to provide the recipient with access to any additional information. At the Company's request, the recipient agrees to return to Houlihan Lokey all information provided in connection with the Transaction ("Transaction Information"). Transaction Information includes this Memorandum and any other materials provided by Houlihan Lokey or the Company as well as any copies of such materials, and any analyses, notes, or other such items based on, derived from, or reflecting information in the Memorandum or the Confidential Information whether or not prepared by the recipient or its representative.

All communications pertaining to this Memorandum, requests for additional information or inquiries relating to a possible Transaction should be directed to the individuals below. Under no circumstances should the Company, its employees, vendors, referral sources, competitors, or its patients be contacted directly.

> **HOULIHAN LOKEY HOWARD & ZUKIN**
> 200 Crescent Court, Suite 1900
> Dallas, TX 75201

**Mark L. Francis**
Managing Director
214.220.8484
mfrancis@hlhz.com

**Scott E. Ellyson**
Senior Vice President
214.220.8472
sellyson@hlhz.com

**Nicholas A. Morse**
Associate
214.220.8478
nmorse@hlhz.com

**Alex Melnyk**
Financial Analyst
312.456.4799
amelnyk@hlhz.com

Issued to: _____

Memorandum #: _____

# TABLE OF CONTENTS



Page

1. Executive Summary .................................................................................................

2. Key Investment Considerations ............................................................................ 5

3. Company Overview ................................................................................................ 12

   Company Description ............................................................................................ 16

   History and Background ....................................................................................... 16

   Corporate Organization ....................................................................................... 20

   Corporate Strategy ............................................................................................... 20

   Products and Services .......................................................................................... 21

   Payor Mix .............................................................................................................. 22

   Facilities ................................................................................................................ 26

   Competitive Landscape ........................................................................................ 27

   Management Team ................................................................................................ 28

   Employees ............................................................................................................. 28

   Sales & Marketing ................................................................................................ 30

   Management Information Systems ....................................................................... 31

   Legal, Regulatory and Other ............................................................................... 32

4. Industry Overview ................................................................................................. 33

5. Detailed Financial Overview ................................................................................ 35

   .................................................................................................................................. 45

## 3. COMPANY OVERVIEW



### Pro-Forma EBITDA

CMS recently executed a new contract to become effective January 2007 that is expected to increase the Company's monthly revenues by approximately 40 percent, based on current utilization patterns. The new business will increase the Company's patient population by approximately 12,000. The Company expects to ramp up expenses beginning in October 2006 in order to have the proper infrastructure and headcount in place to undertake the additional volume. The table below summarizes the departments and number of hires expected in each.

| New Hires (Oct 06 – Apr 07) | |
| --- | --- |
| **Department** | **#** |
| Transition Team | |
| Customer Service Team | |
| Drivers | |
| Front Desk | |
| Dispatch | |
| Human Resources | |
| Clerical | |
| Branch Manager | |
| Loader | |
| Warehouse Supervisor | |
| Total | |

REDACTED

CMS expects the new business to be fully implemented by April 2007, with 40 percent of the new business projected to be fully integrated at the end of January, 60 percent in February, 80 percent in March, and the remaining 20 percent in April. The following exhibit illustrates the Company's estimated pro-forma revenue of $87.8 million and EBITDA of $48.9 million based on projected 2006 results and the anticipated full-year impact associated with the new business.

| Pro-Forma EBITDA | |
| --- | --- |
| *($ in thousands)* | |
| Total Revenues | |
| Cost of Goods Sold | |
| Gross Margin | |
| *% Margin* | |
| Salaries | |
| Delivery Expenses | |
| Other Operating Expenses | |
| Total Operating Expenses | |
| EBITDA | |
| add back: Ramp-Up Expenses | |
| add back: Consulting & Other Adjustments | |
| Adjusted EBITDA | |
| *% Margin* | |

REDACTED

§ JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**09-22962**

## I. (a) PLAINTIFFS

Clinical Medical Services, Inc., a Florida corporation

## DEFENDANTS

Aveta, Inc., a Delaware corporation

**(b)** County of Residence of First Listed Plaintiff    Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kenny Nachwalter, P.A.
201 S. Biscayne Blvd., Suite 1100
Miami, FL 33131

09-CV-22962 - Ungaro/Simonton

CIV-UNGARO
MAGISTRATE JUDGE
SIMONTON

Attorneys (If Known)

FILED by _____ D.C.

OCT - 1 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. — MIAMI

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      (U.S. Government Not a Party)

☑ 4  Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page)

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

U.S. Civil Statute: 28 U.S.C. § 1332(a)

Description: Misappropriation of trade secrets, tortious interference and conspiracy

LENGTH OF TRIAL via  10  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE    10/1/09

FOR OFFICE USE ONLY

AMOUNT $350.00    RECEIPT # 1009281

10/01/09